COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| RODERICK MORRISON, | § | No. 08-13-00319-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | |
| | § | Criminal District Court No.6 |
| THE STATE OF TEXAS, | § | |
| | § | of Dallas County, Texas |
| Appellee. | § | |
| | § | (TC# F-11-56210-X) |
| | § | |

## **O P I N I O N**

Appellant Roderick Morrison was charged with capital murder in the death of Jose Munoz-Bosquez. The jury found Appellant guilty of the lesser-included offense of murder, and the trial court sentenced him to 60 years in prison. Appellant raises four related points of error on appeal, contending the trial court violated his constitutional and statutory rights by excluding him from the courtroom during voir dire, and by not giving him any opportunity to reclaim his right to be present in the courtroom during the remainder of the guilt-innocence phase of his trial. Although we believe the trial court violated Appellant's rights when it excluded him from the courtroom without the opportunity to return, we conclude the error was harmless and affirm. The judgment of conviction, however, contains a clerical error mistakenly reflecting that Appellant

was found guilty of capital murder. We therefore modify the judgment to reflect that Appellant was instead found guilty of murder.[1]

## BACKGROUND

The day before Bosquez's murder, Appellant and 19-year-old Terrence Smith had been drinking and smoking marijuana together in an apartment they shared with Smith's sister, Doyan, who was Appellant's girlfriend and the mother of his child. Terrence Smith testified that he and Appellant left their apartment at approximately 9 or 10 that evening, with Appellant carrying an unloaded gun and a "clip" of ammunition.[2] Shortly before midnight, Appellant advised Smith that he wanted the two of them to either rob someone or to "jack" a car. Smith explained that they were looking for a car with people in it, and that they intended to remove the individuals from the car, take the car, and later sell it. Smith claimed they had no intent to harm or kill anyone in the process. Smith testified that in the early morning hours, Appellant selected a car to "jack" that was parked in an isolated area in the parking lot of their apartment complex. As they approached the vehicle, Smith observed Appellant place the loaded "clip" inside the gun he was carrying.

The victim, Bosquez, who lived in the same apartment complex, was in the car with his girlfriend, Maria de Los Angeles Benitez. Appellant and Smith approached the vehicle on the passenger side where Bosquez was sitting. Appellant placed the gun through a crack in the passenger side window, pointed the gun at Bosquez's head, and ordered Bosquez out of the car. Appellant then told Smith to take Bosquez's wallet from his back pocket. As Smith was taking his wallet, Bosquez unsuccessfully tried to grab Smith's hand. Appellant ordered Bosquez not to

---

[1] This case was transferred from our sister court in Dallas, and we decide it in accordance with the precedent of that Court to the extent required by TEX. R. APP. P. 41.3.

[2] Smith, who was also indicted for capital murder, testified on behalf of the State after being told that the State would offer him a "deal" in exchange for his testimony.

move, and, in response, Bosquez raised his arms into the air. According to Smith, Appellant had his gun pointed within an inch of Bosquez's head this entire time.

Appellant next directed Smith to get Benitez out of the car. While Smith was attempting to open the driver's side door, Bosquez lunged at Appellant. Smith testified that Appellant fired his gun at Bosquez's head, resulting in Bosquez dying at the scene. Appellant and Smith immediately ran from the scene and returned to their apartment.

Benitez testified that she heard, but did not see the shooting. When she saw the two men run away, she left the scene in her car, fearing for her safety. She returned later, however, to describe the incident to police. Benitez testified that she was unable to provide a description of the two men to the police, because it was dark at the time and both she and Bosquez had been drinking.

A witness observed the two men running from the scene to their apartment, and the police were able to locate Appellant and Smith at their apartment within an hour of the shooting. During a search of the apartment, the police found Bosquez's wallet inside a couch, where Smith had placed it. The police took buccal swabs from both men's hands, and subsequent testing revealed gunshot residue on Appellant's hands.

Shortly after Appellant was arrested, Doyan visited Appellant in jail. During a recorded conversation at the jail, Appellant advised Doyan he had shot and killed a man that evening. Appellant claimed the shooting occurred during a struggle in which the victim had "jumped" Smith, and asserted he was simply trying to help Smith by getting the victim "off" of him. Appellant also told Doyan he had intended to shoot the victim in the shoulder, but that the bullet went through the victim's head. Appellant informed Doyan that he had placed the gun in a

3

zippered section of the sofa. He asked Doyan to sell the gun, but she refused. During a subsequent recorded, jail-house phone call with Doyan, Appellant once again admitted to shooting the victim and repeated that he did not intend to shoot the victim in the head.

Appellant was indicted on a single count of capital murder, on the theory that he intentionally committed Bosquez's murder during the course of a robbery.[3] On the first day of trial, Appellant made an outburst in the courtroom during jury selection, and the trial court granted defense counsel's motion for a mistrial. The trial court assembled a new jury panel the next day, but during voir dire, Appellant made a second outburst, and the trial court immediately removed him from the courtroom and placed him in a holdover cell where he was able to listen to the proceedings through a speaker for the remainder of the guilt-innocence phase of his trial.

During trial, Appellant's attorney repeatedly advised the jury that Appellant was not disputing the fact that he had shot the victim, and was not claiming that this was a case of mistaken identity. Instead, defense counsel argued that Appellant did not intentionally murder Bosquez during the robbery, as required for a capital murder conviction, and that the shooting was an unintentional, yet tragic, outcome of the events that occurred the morning of the shooting. Defense counsel acknowledged that his client was clearly guilty of the lesser-included offense of murder, admitting that Appellant shot Bosquez with a deadly weapon, albeit without intending to kill him. Defense counsel repeatedly advised the jury that he was not requesting an outright acquittal, and that he was instead requesting the jury to acquit Appellant of capital murder and instead find him guilty of the lesser-included offense of murder.

---

[3] A person commits capital murder if, among other things, the person commits murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2014).

4

At the close of evidence, the trial court instructed the jury that in order to find Appellant guilty of capital murder, it was required to find that Appellant had intentionally murdered the victim during the course of committing or attempting to commit the offense of robbery. The court also instructed the jury that if it had a reasonable doubt regarding whether Appellant was guilty of capital murder, it was required to consider whether Appellant was guilty of the lesser-included offense of murder. In the application paragraph of the charge, the trial court informed the jury that Appellant could be found guilty of murder if it found he had shot the victim "with a firearm, a deadly weapon[.]" [4]

The jury found Appellant guilty of murder. At Appellant's request, the trial court assessed Appellant's punishment, and the trial court allowed Appellant to return to the courtroom for his sentencing hearing. After finding the two enhancement paragraphs in the indictment (alleging that Appellant had previously been convicted of robbery and burglary of a habitation) to be true, the trial court sentenced Appellant to 60 years in prison.

**DISCUSSION**

In four separate points of error, Appellant contends the trial court violated his rights under the United States and Texas Constitutions, as well as his statutory rights, by excluding him from the courtroom during jury voir dire, and by not giving him the opportunity to reclaim his right to be present in the courtroom at any point during the guilt-innocence phase of his trial. Although we agree the trial court violated Appellant's constitutional and statutory rights, we conclude the trial court's error was harmless.

---

[4] The act of shooting an individual with a firearm is considered an act that is clearly dangerous to human life, and therefore the requisite intent for murder may be inferred from this act alone. *See, e.g., Cavazos v. State*, 382 S.W.3d 377, 384 (Tex.Crim.App. 2012) (the requisite intent to kill to sustain a murder conviction may be inferred from the use of a deadly weapon).

5

**Procedural Background**

The record before us reflects that while Appellant was in jail awaiting trial, he engaged in conduct that caused him to be evaluated for competency to stand trial on several occasions.[5] The first record we have is of a pretrial conference held on July 18, 2012, where it was revealed that Appellant's case had been reset on two prior occasions after Appellant had acted mentally ill during court proceedings, and that the trial court had ordered Appellant examined for competency to stand trial on both of those occasions. The trial court noted that the psychiatrists who had examined Appellant found him competent to stand trial on both occasions. Appellant's attorney acknowledged that the examining psychiatrists had expressed their opinions that Appellant had been purposely acting mentally ill in order to avoid trial. The trial court advised Appellant she would be setting the matter for trial, and admonished Appellant that he needed to cooperate with his attorney in preparing for trial.

At a subsequent pretrial hearing on July 11, 2013, defense counsel requested that Appellant be examined for competency once more before trial. During this hearing, Appellant denied that a third evaluation was necessary, and repeatedly stated that he had already been evaluated; that he understood the nature of the proceedings; that he was competent to stand trial; and that he was ready to attend his trial. The trial court nevertheless ordered a third evaluation, after which Appellant was once again found competent to stand trial.

Appellant's trial initially went forward with jury selection on August 26, 2013. Prior to

---

[5] According to the State's amended notice of extraneous offenses, while awaiting trial Appellant was naked in his jail cell at least three times; had spread fecal matter on himself; had been heard cursing, yelling, and threatening jail staff; and had been using PCP. At the July 18 pretrial conference, Appellant made comments that he was being represented by an attorney named "Seven P. Adams," despite also acknowledging that his attorney, who was in the courtroom with him that day, did not go by that moniker; claimed that he did not know who brought him to court that day; and asked the judge if the jail staff would be able to take him to the "park" after the hearing concluded.

voir dire, Appellant's counsel made a record that he had been able to speak with his client on numerous occasions prior to trial; that he believed he had been able to effectively communicate with Appellant to prepare his defense; that Appellant appeared to understand the nature of the proceedings; and that Appellant generally appeared to be competent to stand trial. Counsel recognized that Appellant had persisted in presenting himself during pretrial hearings as being in a state of "befuddlement," and mentioned that the State had evidence of various communications between Appellant and Doyan and other individuals while incarcerated, indicating that he had been intentionally acting mentally ill so that he would "appear to be incompetent or insane," in an apparent attempt to avoid going to trial or so that he would be sent to a mental hospital.

Defense counsel was allowed to question Appellant regarding his decision to have the trial court assess punishment in the event that he was found guilty, and Appellant appeared to be cooperative and lucid while being questioned. Shortly thereafter when voir dire began, Appellant initially remained silent while the prosecutor spoke to the jury. Eventually, however, Appellant interrupted the proceedings, and the following exchange occurred:

> THE DEFENDANT: No, no, stop. Stop. Get this thought process off of me. Get it off. Get it off. Get it off. Get it off. Get it off me.
>
> THE COURT (speaking to the jury panel): Would y'all please step out into the hall.
>
> THE DEFENDANT: It's still in my brain. Lo-lo, help me. Help me. Help me. Help me, lo-lo. Help me. It's getting in my brain. Help me, lo-lo. Help me. Help me. Get it off of me. It's still in my brain. I can't think. I can't think. I can't think. Oh. Please, I need some help. Please get it off of me. Get it off of me. Get it off of me. These are my thoughts. These are my thoughts. Get it off of me. Just get it off of me. Just get it off of me. Please make it stop. Make it stop. Get it off of me. Get it off of me.

After the jury panel was sent to the hallway, the trial court admonished Appellant that his trial would go forward; that he had been examined three times and determined to be competent;

and that the psychiatrists who had examined him believed that he was "faking" mental illness or "malingering" in order to avoid going to trial. The trial court warned Appellant several times that if he did not sit quietly in the courtroom, she would have him placed in the "holdover cell" for his entire trial. Appellant did not directly respond to the trial court's warning, and instead complained that "Agent Chris Green" was attempting to "steal" his brain, and that he was hearing "voices." Appellant claimed he had not been given his medicine that morning at the jail, insinuating that this may have caused his disruptive conduct; Appellant further advised the trial court that he did not want to return to the courtroom until he had been given his medication.

It was determined that Appellant had not been given any medication at the jail that morning. The trial court granted a mistrial, dismissed the jury panel, and advised the parties that she intended to begin the trial the following morning with a new jury panel. Before adjourning for the day, the prosecutor advised the trial court that the State wished to proffer various letters and recorded phone calls that Appellant had made from the jail, in which he had indicated his intent to intentionally act mentally incompetent to either avoid trial or to be sent to a mental hospital.[6] The trial court, however, did not rule on the State's request, and instead ordered Appellant to undergo a fourth evaluation by a jail psychiatrist prior to jury selection the next day to determine whether Appellant was competent to stand trial at that time. The trial court warned defense counsel that if Appellant "acted up" again the next day, he would be placed in the "holdover" cell during his trial.

The jail psychiatrist who examined Appellant the next morning provided the trial court with a handwritten report, stating his opinion that Appellant was competent to stand trial. The

---

[6] These letters, most of which were written to Doyan, were later entered into evidence during the punishment phase of Appellant's trial. In his letters, Appellant described his plan to continue pulling his "stunts" and to give a performance in court worthy of a "grammy award" until he was sent to a mental hospital, and that he did not intend to heed his attorney's advice to stop "faking" mental illness.

trial court advised Appellant of the psychiatrist's findings, and that she intended to go forward with the trial as planned. The trial court further informed Appellant that he had a right to be present during his trial, but that he would lose that right if he was disruptive. The trial court emphasized that she would not tolerate any further outbursts from Appellant, and that if he had even one additional outburst, she would have him taken to the holding cell for the "rest of the trial." After Appellant acknowledged that he understood these warnings and promised to conduct himself appropriately, the trial court concluded with the following warning:

> Now that I have checked the law, checked the medical situation for you, and as far as I am concerned protected all of your constitutional rights to the best of my ability, if you act up again, *immediately you will be taken to the holdover cell*. I release the jury into the hallway. Once you are taken care of in there, I will bring them right back in and trial will continue without you in the courtroom. (Emphasis added).

Appellant thereafter sat quietly while the prosecutor conducted voir dire. Shortly after Appellant's attorney introduced himself to the jury panel, however, Appellant interrupted the proceedings as follows:

> THE DEFENDANT: No, tell them who you are, Chris Green. Tell them who you are. Don't listen to him. He is FBI. Don't listen to him, nobody. Don't listen to him.
>
> THE COURT: Everyone step outside.
>
> THE DEFENDANT: He's not telling the truth. Don't listen to him. Tell them who you are, Chris Green. Tell them who you are. Tell them who you are.
>
> THE COURT: Do not take another break. Just stand outside in the hall.

The trial court immediately had Appellant removed from the courtroom and placed in the holding cell. The trial court then brought the panel back in and told them that Appellant had been admonished prior to trial if he had "any kind of outburst, that he would be put into the holding cell

9

and he would hear the trial through the microphone" in the cell. She assured the jury panel that even though Appellant would "be in the holding cell for the remainder of the trial[,]" he would receive a "fair trial." The trial court also advised the panel that Appellant had been examined prior to trial and had been found "mentally competent" to stand trial under the "legal standard."

Appellant's attorney did not object to Appellant's removal from the courtroom, and instead appeared to acquiesce in the trial court's decision, advising the jury panel that what had occurred was "not necessarily unexpected," and that "contingencies" had been made to ensure that Appellant would receive a fair trial. Later in the jury selection process, after a panel member expressed concern about Appellant's outburst, defense counsel stated: "I know that it's very unusual to have my defendant sitting back there listening to these proceedings. But I am telling y'all that if we all do our jobs – it doesn't matter where he is sitting if we all do our jobs and understand what we are trying to do."

Appellant was excluded from the remainder of jury selection, as well as the entire three-day, guilt-innocence phase of his trial. There is no record that Appellant was ever offered the opportunity to return to the courtroom, or that his attorney ever requested that he be given the opportunity to return. However, defense counsel did make a record that he had met with Appellant during breaks in the trial to discuss the evidence presented at trial, and to get Appellant's input on trial strategy. According to defense counsel, Appellant asked him "some pertinent questions" during these breaks, indicating that he appeared cognizant of the proceedings; however, counsel stated that "for the most part," Appellant did not indicate a "desire to speak with [him]."

Before the close of evidence on the last day of trial, Appellant was brought into the courtroom, where he was questioned by defense counsel outside the presence of the jury regarding

his decision to not testify at trial. At that time, Appellant appeared lucid, and acknowledged that he was voluntarily giving up his right to testify at trial. Appellant complained that the "stun belt" he had previously been wearing while in the courtroom during jury selection had been "messing" with his head, and informed the court that he had started feeling somewhat better after it was removed while he was in the holding cell.[7] Appellant was then taken back to the holding cell, where he remained while the attorneys gave closing arguments to the jury.

The jury rendered its verdict on August 30, 2013, but Appellant's punishment hearing before the court was not held until over a week later on September 9, 2013. Appellant was allowed to be present at the punishment hearing, and conducted himself appropriately throughout that hearing.

At the punishment hearing, the State presented evidence of the letters Appellant had written from his jail cell indicating that he had planned to feign mental illness in order to avoid a trial or to be sent to a mental hospital. Appellant presented no evidence on his behalf and did not testify at the hearing. At Appellant's request, he was allowed to apologize to the court for his "behavior during trial," without being subject to cross-examination by the State. In particular, Appellant apologized for "acting slow" during various court proceedings, acknowledging that he was "faking" when he did so. However, Appellant claimed that he did have a "real mental health problem," which he believed had caused him to be "kicked out of the courtroom[.]" Appellant further advised the court that he had wanted to be present during his trial. Appellant informed the court, however, that he was satisfied with the manner in which his attorney had represented him throughout the proceedings.

---

[7] The record reflects that Appellant had been wearing the stun belt when he was in the courtroom during jury voir dire due to the State's concern that he might become disruptive.

**Standard of Review**

We review a trial court's decision to exclude a criminal defendant from trial for an abuse of discretion. *See, e.g., Kessel v. State,* 161 S.W.3d 40, 44 (Tex.App. – Houston [14th Dist.] 2004, pet. ref'd); *see also Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (courts must be given sufficient discretion to determine the appropriate manner of handling a disruptive defendant in the courtroom). We will uphold the trial court's ruling so long as it is "within the zone of reasonable disagreement."[8] *Kessel,* 161 S.W.3d at 44 (citing *Wheeler v. State,* 67 S.W.3d 879, 888 (Tex.Crim.App. 2002)).

**The Right to be Present in the Courtroom During Trial**

The Sixth Amendment's right of confrontation requires any defendant threatened with the loss of liberty to be physically present at all phases of the criminal proceedings against him. *Allen,* 397 U.S. at 338, 90 S.Ct. at 1058; *Miller v. State*, 692 S.W.2d 88, 90 (Tex.Crim.App. 1985); *see also Sanchez v. State,* 702 S.W.2d 258, 259 (Tex.App. – Dallas 1985, pet. ref'd) (criminal defendant has a fundamental right be present at every stage of his trial). The Texas Constitution provides the defendant with a similar right to be present in the courtroom during his trial.[9] TEX. CONST. art. I, § 10; *Sanchez,* 702 S.W.2d at 259 (agreeing with defendant's contention that both

---

[8] Defense counsel's failure to object to Appellant's exclusion from the courtroom does not preclude our review of this issue. A defendant's right to be present during his trial is not subject to ordinary preservation of error rules; rather, it is considered a basic right that must be implemented unless expressly waived by the defendant. *Allen*, 397 U.S. at 338, 90 S.Ct. at 1058; *Kessel,* 161 S.W.3d at 44, n.1 (appellant's right to be present in the courtroom must be implemented by the judicial system unless expressly waived); *Reyna v. State*, No. 04-12-00584-CR, 2013 WL 5508372, at *3 (Tex.App. – San Antonio Oct. 2, 2013, no pet.) (mem. op., not designated for publication) (same). Appellant did not expressly waive his right to be present in the courtroom.

[9] Appellant acknowledges that the Texas Constitution provides no greater rights than the United States Constitution in terms of a defendant's right to be present in the courtroom during his trial. *See e.g., Burks v. State,* 792 S.W.2d 835, 836-38 (Tex.App. – Houston [1st Dist.] 1990, pet. ref'd) ("We find no cases that extend Texas constitutional guarantees regarding a criminal defendant's right to be present in a courtroom during trial beyond those found in the federal constitution."). We therefore analyze Appellant's claim that the trial court violated his constitutional rights under the standards set forth in *Allen*. *See, e.g., Sanchez*, 702 S.W.2d at 259 (applying the *Allen* analysis to the appellant's claim that the trial court violated his rights under the Texas Constitution to be present in the courtroom).

12

the federal and state constitutions give a defendant the right to be present at every stage of his trial).

A defendant's constitutional right to be present in the courtroom is not unlimited, however, and a court may, it its discretion, find it necessary to remove a defendant from the courtroom for acting in a disruptive, obstreperous, or contemptuous manner. *Allen,* 397 U.S. at 343-44, 90 S.Ct. at 1061. As the Supreme Court has noted, it is "essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country," and the "flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." *Id.* Recognizing the need for flexibility in dealing with such defendants, the Supreme Court has instructed that a trial court may deal with a disruptive defendant in at least "three constitutionally permissible ways": (1) allowing the defendant to remain in the courtroom, but have the defendant bound and gagged; (2) citing the defendant for contempt, which could require the court to discontinue the trial and imprison the defendant until such time as the defendant promises to behave himself; and (3) removing the defendant from the courtroom "until he promises to conduct himself properly." *Id.* at 344-45, 90 S.Ct. at 1061.

The Court in *Allen* held that removal from the courtroom would be warranted if, after being warned by the trial court of the possibility of removal, the defendant continues to conduct himself "in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." 397 U.S. at 343, 90 S.Ct. at 1060-61. For constitutional purposes, the defendant need only be present in the courtroom at the commencement of a trial, which includes any time after the voir dire process has begun, and may thereafter voluntarily

13

absent himself from the trial, either expressly or through his disruptive conduct. *See Sumrell v. State*, 326 S.W. 3d 621, 624 (Tex.App. – Dallas 2009), *pet. dism'd*, 320 S.W.3d 338 (Tex.Crim.App. 2010) (per curiam) (a defendant waives his constitutional right to be present in court by voluntarily absenting himself after the commencement of trial proceedings) (citing *Allen*, 397 U.S. at 342, 90 S.Ct. 1057); *see also Miller,* 692 S.W.2d at 91 (defendant who is present at the time voir dire begins, but who thereafter voluntarily removes himself from the courtroom, forfeits his Sixth Amendment rights); *Tracy v. State,* 14 S.W.3d 820, 826 (Tex.App. – Dallas 2000, pet. ref'd) (defendant's Sixth Amendment rights were not violated when he voluntarily absented himself from trial after the commencement of voir dire, but before jury was selected); *Ashley v. State,* 404 S.W.3d 672, 680 (Tex.App. – El Paso 2013, no pet.) ("After commencement of trial proceedings, a defendant may voluntarily absent himself from the trial without a violation of his Sixth Amendment right to be present during all phases of the trial.").

However, in Texas a defendant is given additional protection by statute and has an absolute right to remain in the courtroom until the jury has been selected. *Sumrell*, 326 S.W.3d at 623, n.2 ("[t]his right is codified under state law in article 33.03 of the Texas Code of Criminal Procedure, which is even more protective of a defendant's rights than the constitutional provisions because the right to be present cannot be waived before the jury is selected.") (citing *Miller,* 692 S.W.2d at 91). Specifically, Article 33.03 of the Texas Code of Criminal Procedure provides, in relevant part: "In all prosecutions for felonies, the defendant must be personally present at the trial . . . provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, *or after the jury has been selected when trial is before a jury*, the trial may proceed to its conclusion." TEX. CODE CRIM. PROC. ANN. art. 33.03 (West 2006)

14

(emphasis added).

Thus, as the Texas Court of Criminal Appeals has recognized, although a defendant may waive his Sixth Amendment right to be present in the courtroom virtually any time after a trial commences, under Article 33.03, "an accused's right to be present at his trial is unwaivable until such a time as the jury has been selected."[10] *Miller,* 692 S.W.2d at 89. Similarly, as the Dallas Court of Appeals has concluded, while a defendant's Sixth Amendment rights are not violated when the defendant voluntarily absents himself after his trial has commenced, his statutory rights are violated when the trial court holds jury selection in his absence, because the "right to be present until selection of the jury cannot be waived." *Tracy,* 14 S.W.3d at 826. This Court has also held that a defendant's right to be present in the courtroom until jury selection is completed is mandatory and cannot be waived. *Ashley v. State,* 404 S.W.3d 672, 680 (Tex.App. – El Paso 2013, no pet.) (distinguishing between the constitutional right to be present at trial that may be forfeited, and the statutory right to be present through jury voir dire, which may not be waived); *see also Bledsoe v. State,* 936 S.W.2d 350, 351 (Tex.App. – El Paso 1996, no pet.) (given the mandatory language of the statute, it is error to proceed with a trial if the defendant is absent during jury selection regardless of the reasons for the absence).

**Appellant's Statutory Rights were Violated**

---

[10] Appellant asserts that, in light of this statute, we should read a similar requirement into Article 1, § 10 of the Texas Constitution, and find that a defendant has an absolute constitutional right to remain in the courtroom until after jury selection has been completed. We decline to do so. Appellant has cited no authority, and we are not aware of any Texas courts that have adopted this interpretation. Moreover, we note that in *Miller v. State*, the Court of Criminal Appeals observed that a major purpose behind the Legislature's 1979 amendment to Article 33.03, which allows a trial to continue after a jury is selected if the defendant later voluntarily absences himself from the courtroom, was directed at non-constitutional concerns, such as the need to avoid the "expense and inconvenience of selecting a jury, having to discharge the jury and reset the case and undertaking the entire process again[.]" *Miller,* 692 S.W. 2d at 93. Accordingly, we do believe that the Legislature's amendment to Article 33.03 has any bearing on how we should interpret the provisions of the Texas Constitution.

15

In the present case, Appellant argues, and the State concedes, that the trial court's actions in removing Appellant before the jury was selected violated Appellant's rights under Article 33.03 to be present in the courtroom during jury selection.   Since the right to be present in the courtroom until jury selection has concluded is nonwaivable, we agree that Appellant's rights were violated when the trial court removed him from the courtroom before jury selection was complete.   As the Supreme Court in *Allen* noted, the trial court had other options available for dealing with Appellant's disruptive behavior in the courtroom, such as temporarily stopping the proceedings, citing Appellant for contempt, or having him bound and gagged for the remainder of the jury selection process.   397 U.S. at 344, 90 S.Ct. at 1061.

## Appellant's Constitutional Rights were Violated

 Having found that Appellant's statutory rights were violated by his removal from the courtroom, we next consider whether his constitutional rights were also violated.

Initially we note that Appellant does not deny that he engaged in disruptive conduct in the courtroom during jury voir dire that may have warranted his initial removal, and he further acknowledges that he was repeatedly warned at various times that if he continued his conduct he would be removed from the courtroom.   Instead, Appellant complains that his "single outburst" on the second morning of jury voir dire was not so extreme as to warrant his removal from the *entire* trial, without the possibility of being allowed to redeem himself and return to the courtroom upon a promise to conduct himself properly.

We agree with the State that Appellant was not removed from the courtroom based solely on a "single outburst," and instead, the trial court clearly took into consideration that Appellant had made an outburst the day before, resulting in a mistrial.   We can therefore sympathize with the

16

trial court's desire to ensure the trial would go forward without a second mistrial, and we further recognize the troublesome nature of Appellant's conduct, particularly given the allegations that he was feigning mental illness.

In addition, we believe the trial court should be commended for taking appropriate steps to ensure that Appellant was taken to an area where he was able to hear the remainder of the proceedings electronically, and for allowing defense counsel to meet with Appellant periodically to discuss trial strategies. *See generally Allen,* 397 U.S. at 351, 90 S.Ct. at 1064 (Brennan, J., concurring) (stating that "when a defendant is excluded from his trial, the court should make reasonable efforts to enable him to communicate with his attorney and, if possible, to keep apprised of the progress of his trial . . . it is not weakness to mitigate the disadvantages of his expulsion as far as technologically possible in the circumstances").[11]

Nevertheless, Appellant is correct in pointing out that under *Allen*, a defendant must be given the opportunity to return to the courtroom upon demonstrating he is ready to conduct himself appropriately. In particular: "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Allen,* 397 U.S. at 343, 90 S.Ct. at 1061. In concluding the defendant's constitutional rights were not violated, the Court in *Allen* found it significant that the defendant "was constantly informed that he could return to the trial when he would agree to conduct himself in an orderly manner." *Id*. at 346, 90 S.Ct. at 1062. In

---

[11] *See also State v. Gillam,* 629 N.W.2d 440, 451 (Minn. 2001) (trial court properly removed disruptive defendant from the courtroom on three separate occasions, and ultimately allowed the defendant to listen to the proceedings via speakerphone); *United States v. Ives,* 504 F.2d 935, 938 (9th Cir.1974), *vacated on other grounds,* 421 U.S. 944, 95 S.Ct. 1671 (1975), *opinion reinstated in relevant part,* 547 F.2d 1100 (1976) (trial court properly removed continually disruptive and violent defendant from the courtroom, but ordered the installation of special equipment in defendant's jail cell that allowed him to hear the proceedings and to communicate with his counsel during the trial); *United States v. Munn,* 507 F.2d 563, 567 (10th Cir. 1974) (trial court acted properly by allowing defendant, who was temporarily removed from the courtroom, to hear the proceedings through a broadcast system).

fact, in *Allen*, the defendant was returned to the courtroom twice upon agreement that he would conduct himself properly, and despite having violated his prior agreement to conduct himself appropriately, he was allowed to return to the courtroom after his second removal, upon his assurances that he would conduct himself appropriately. *Id.* at 340-41, 90 S.Ct. at 1059.

It does not appear that the courts in Texas have directly addressed whether *Allen* affirmatively requires a trial court to give a defendant the opportunity to return to the courtroom upon an assurance that he will conduct himself appropriately. However, most courts that have expressly considered the issue have recognized that *Allen* requires a trial judge who has removed a disruptive criminal defendant from the courtroom to, in some form or fashion, offer the defendant the opportunity to reclaim his constitutional right to be present at his trial. *See, e.g., Jones v. Murphy,* 694 F.3d 225, 249 (2d Cir. 2012) (the Court in *Allen* requires first that a defendant must be warned before being removed from the courtroom, and second, that a "defendant who has previously lost the right to presence be able to reclaim it").[12] As explained by the Alaska Supreme Court, when a trial court decides to "indefinitely bar" a defendant from his trial based solely upon his "past misconduct and the surmise that the disruptive conduct may continue," the court violates the mandate set forth in *Allen*, requiring a court to offer a defendant the opportunity to reclaim his position in the courtroom by altering his behavior. *Douglas v. State,* 214 P.3d 312, 323 (Alaska

---

[12] *See also United States v. Ward,* 598 F.3d 1054, 1060 (8th Cir. 2010) (concluding that the trial court violated a defendant's constitutional rights when it removed him from the courtroom at the start of trial and did not "cure that error by subsequently affording him a reasonable opportunity to return"); *Chavez v. Pulley,* 623 F.Supp. 672, 681-82 (E.D.Cal.1985) ("[A] trial judge who has removed a criminal defendant from the courtroom because of his disruptive behavior must offer the defendant the opportunity to reclaim the right of presence and the privilege to testify."); *State v. Strich,* 915 A.2d 891, 899-900 (Conn. App. 2007) (holding that the trial court erred because it "never informed the defendant that, with proper assurances, he could reclaim his right to be present for the remaining courtroom proceedings" but that the error was harmless); *State v. Aceto,* 100 P.3d 629, 630-31, 638-39 (Mont. 2004) (the trial court erred when it did not give the defendant a chance to return to the courtroom when he apologized after repeated bad behavior); *Goston v. State,* 939 S.W.2d 818, 820 (Ark. 1997) (although "the trial court's knowledge of a defendant's past behavior is a relevant consideration," the trial court abused its discretion by failing to afford the defendant any opportunity to reclaim his right of confrontation, despite his requests to return and promises to behave).

2009).

However, what steps a trial court must take to ensure that a defendant is allowed the opportunity to reclaim his right to be present in the courtroom is not entirely clear. At one extreme, some courts have concluded that a trial court itself must shoulder the burden of speaking with a defendant periodically throughout a trial to determine if the defendant is willing and ready to return to court in a calmed condition. For example, when conducting habeas review of a California trial court's decision to remove a defendant from the courtroom during his trial, a federal district court held the trial court had erred by allowing defense counsel to act as a go-between in conveying to the defendant that he had a right to reclaim his presence in the courtroom. *Chavez v. Pulley,* 623 F.Supp. 672, 682 (E.D. Cal. 1985). The court concluded the trial court was instead required to bring the defendant back to the courtroom to explain to the defendant on the record that he had a right to return to the courtroom, or alternatively, to send a court reporter to record an assurance conveyed by the bailiff or defense counsel that the defendant had a right to reclaim his presence. *Id.*; *see also United States v. Ward,* 598 F.3d 1054, 1059 (8th Cir. 2010) (trial court violated defendant's rights by failing to directly speak with defendant to determine if he was ready to return to the courtroom, and by instead using defense counsel as an "intermediary"); *State v. Carey,* 856 N.W.2d 1, 12 (Iowa Ct. App. 2014) (the trial court abused its discretion when it excluded the defendant from the courtroom for the remainder of his trial without returning him to the courtroom to "conduct an in-person, on-the-record assessment of whether he was willing to conduct himself consistently with the decorum and respect judicial proceedings require"); *State v. Fletcher,* 314 S.E.2d 888, 890-91 (Ga. 1984) (trial court erred by not bringing a defendant back to the courtroom to inform him of his ability to reclaim his right to be present,

19

where the defendant was removed from the courtroom without warning).[13]

Other courts expressly addressing this issue have minimized the trial court's role in the process, and have held that, although a defendant has the right to reclaim his presence in the courtroom, the burden is on the defendant or defendant's counsel to inform the court that the defendant is ready to return to the courtroom and is willing to conform his conduct to the court's requirements. *See, e.g., State v. Gillam,* 629 N.W.2d 440, 452 (Minn. 2001) ("*Allen* indicates that the defendant has the burden to inform the court when he is ready to physically return and conform his conduct to the requirements of the court."); *State v. Chapple,* 36 P.3d 1025, 1032-33 (Wash. 2001) (trial court ensured that defendant was given an adequate opportunity to return to court by requiring defense counsel to periodically speak with the defendant and report back to the court).

Although the Texas Court of Criminal Appeals has not directly addressed the issue, in *Kimithi,* the Court spoke approvingly of a trial court's actions in using defense counsel as an intermediary to determine when a disruptive defendant who had been removed from the courtroom was ready to be returned. *Kimithi v. State,* 546 S.W.2d 323, 325 (Tex.Crim.App. 1977). In particular, the Court noted that before removing the defendant, the trial court had "instructed [the defendant] that he could return to the courtroom if he would conduct himself in an orderly fashion[,]" and had instructed the defendant's attorneys "to notify the court when the [defendant] was willing to behave." *Id.* In concluding the trial court did not violate the defendant's

---

[13] We also note that the American Bar Association takes the position that a trial court should be proactive in offering a removed defendant the right to reclaim his place in the courtroom in the *ABA Standards for Criminal Justice,* "Special Functions of the Trial Judge" (3rd ed.2000), § 6–3.8, Commentary, p. 65, which provides that: "A defendant may be removed from the courtroom during trial when the defendant's conduct is so disruptive that the trial cannot proceed in an orderly manner. Removal is preferable to gagging or shackling the disruptive defendant. The removed defendant ordinarily should be required to be present in the court building while the trial is in progress. *The removed defendant should be afforded an opportunity to hear the proceedings and, at appropriate intervals, be offered on the record an opportunity to return to the courtroom upon assurance of good behavior.* The offer to return need not be repeated in open court each time. A removed defendant who does not hear the proceedings should be given the opportunity to learn of the proceedings from defense counsel at reasonable intervals." (Emphasis added).

constitutional rights when it removed the defendant under these circumstances, the Court cited *Allen* for the proposition that "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case," and that "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Id.* at 326.

Similarly, in *George v. State,* 446 S.W.3d 490 (Tex.App. – Houston [1st Dist.] 2014, pet. ref'd), our sister court held that a defendant's constitutional rights were not violated by the trial court's actions in removing an unruly defendant from the courtroom, where the trial court directed defense counsel to consult with the defendant about returning to the courtroom throughout the proceedings. *Id.* at 502. In reaching this conclusion, the court cited with approval that the trial court had encouraged the defendant to return to the courtroom, had admonished the defendant concerning the dangers of missing his trial, and, utilizing defense counsel as an intermediary, had made reasonable attempts to assess whether the defendant would agree to conduct himself in an orderly manner if returned to the courtroom. *Id.*

In addition, the Dallas Court of Appeals concluded that a defendant's Sixth Amendment rights were not violated where the trial court allowed the defendant to be returned to the courtroom, albeit not as soon as the defendant would have liked, upon his assurances that he would conduct himself appropriately. *Lampkins v. State,* No. 05-98-01920-CR, 2000 WL 306994, at *4 (Tex.App. – Dallas Mar. 27, 2000, pet. ref'd) (not designated for publication). In that case, The Dallas Court rejected the defendant's argument that his constitutional rights were violated because he was not returned to the courtroom earlier, noting that defense counsel never requested his return, and may have had a strategic reason for not doing so. *Id.* at *5. Nevertheless, the trial

court ultimately allowed the defendant to return and remain in the courtroom for the remainder of the proceedings upon his assurance that he would conduct himself appropriately. Under those circumstances, the Dallas Court held, the defendant's constitutional rights were not violated. *Id.*; *see also Molett v. State,* No. 05-08-00728-CR, 2009 WL 824761, at *8 (Tex.App. – Dallas March 31, 2009, pet. ref'd) (not designated for publication) (defendant's constitutional rights were not violated where trial court asked defendant to return during a break in the proceedings, but the defendant refused to do so).

Although there does not appear to be a bright-line rule in Texas requiring a trial court to follow a particular method to ensure that a defendant is given a reasonable opportunity to return to the courtroom, it appears that, at a minimum, the trial court should inform the defendant of his right to return to the courtroom, and should, either directly or indirectly by using defense counsel as an intermediary, take reasonable steps to assess whether the defendant is ready to reclaim his right to return to the courtroom. In reaching this conclusion, we do not mean to imply that a trial court must accede to a defendant's every request to be returned to the courtroom upon a mere promise that he will conform his conduct to the court's requirement upon his return. To the contrary, we recognize that in some instances, it may be clear that a defendant's promise may have no value depending on the circumstances, and a trial court must be given the discretion to evaluate the genuineness of any such promise. *See, e.g.*, *Carey,* 856 N.W.2d at 13 ("We do not deem the foregoing language [quoting *Allen*], however, to be an absolute mandate dictating the return of every defendant who has been removed from the courtroom simply on his verbal promise to reform.") (citing *United States v. Munn*, 507 F. 2d 563, 568 (10th Cir. 1974)). For example, a trial court may be justified in not believing a defendant's promise to conduct himself appropriately,

where the defendant has repeatedly broken that promise in the past, and may at some point determine that it would be futile to continue to offer a defendant an opportunity to redeem himself. *See, e.g., United States v. Nunez,* 877 F.2d 1475, 1476-78 (10th Cir. 1989) (holding that it was not error to refuse to allow defendant to return for third time, after allowing him to return twice unsuccessfully upon promises to behave); *People v. Medina,* 11 Cal.4th 694, 47 Cal.Rptr.2d 165, 906 P.2d 2, 26 (1995) (rejecting defendant's argument that trial court erred in refusing to allow defendant to return for sixth time, after allowing him to return five times upon promises to behave); *Gillam,* 629 N.W.2d at 452 (holding that it was no abuse of discretion to refuse to allow defendant to return for third time, after allowing him to return twice upon promises to behave); *see also Burks v. State,* 792 S.W.2d 835, 836-38 (Tex.App. – Houston [1st Dist.] 1990, pet. ref'd) (trial judge removed defendant during trial, but allowed him to return at least two times; but, when the defendant's disruptive conduct persisted, the trial court properly expelled him from the courtroom for the remainder of the trial).

Moreover, in other circumstances, the defendant's initial conduct may be so extreme, outrageous, or violent that it would be futile, or perhaps even dangerous, to offer the defendant the opportunity to return to the courtroom. *See, e.g., Jones,* 694 F.3d at 249 (trial court acted reasonably in refusing to give defendant additional opportunities to return to the courtroom after defendant displayed violent tendencies, posing a safety risk to those present in the courtroom); *Dotson v. State,* 785 S.W.2d 848, 853-54 (Tex.App. – Houston [14th Dist.] 1990, pet. ref'd) (defendant was properly expelled from the courtroom for the short remainder of his trial, without providing him with the opportunity to reclaim his right to be present, where the defendant had twice displayed disruptive conduct, and then engaged in a "violent scuffle" with the bailiff upon

23

being removed from the courtroom).

In the present case, however, Appellant's conduct, while troublesome, was neither extreme nor dangerous. While we recognize that Appellant was given one opportunity to redeem himself after the trial court granted defense counsel's request for a mistrial the day before, the trial court provided no further opportunities for Appellant to correct his conduct after being removed from the courtroom on the first day of his three-day trial. Further, the broad nature of the trial court's order, in which she stated in front of the jury that Appellant would not be returned to the courtroom for the remainder of his trial, would have discouraged both the defendant and his attorney from raising the possibility of his return at any point during those three days.

Under these circumstances, the trial court's indefinite, and seemingly permanent, ban on Appellant's ability to be present in court violates the mandate of *Allen* that defendants must be allowed to reclaim the right to attend their trial upon a finding that they are able and willing to conduct themselves "consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Allen,* 397 U.S. at 343, 90 S.Ct. at 1061. We therefore conclude that Appellant's constitutional rights were violated by the trial court's failure to provide him with the opportunity to reclaim his right to be present in the courtroom during his trial.

However, our inquiry does not stop here. We must next determine whether this violation was harmless.

**Harmless Error Analysis**

Initially, we note that the deprivation of a defendant's statutory or constitutional right to be present during trial is subject to a harmless error analysis. *Jasper v. State*, 61 S.W.3d 413, 423 (Tex.Crim.App. 2001); *see also Sumrell v. State*, 326 S.W.3d 621, 624-27 (Tex.App. – Dallas

24

2009), *pet. dism'd as improvidently granted*, 320 S.W.3d 338 (Tex.Crim.App. 2010) (applying harmless error standard in determining whether a defendant's improper removal from the courtroom required reversal); *Kessel,* 161 S.W.3d at 48 (analyzing constitutional error of defendant's unwarranted removal for harmless error). Further, when a defendant has been deprived of both his statutory and his constitutional right to be present in the courtroom during trial, we should apply the more rigorous standard set forth in Rule 44.2(a) of the Texas Rules of Appellate Procedure for determining whether a constitutional error was harmless beyond a reasonable doubt. *Jasper v. State,* 61 S.W.3d 413, 423 (Tex.Crim.App. 2001) (because the court was faced with both non-constitutional and constitutional error, court applied the higher standard of harm for constitutional error, *i.e.,* whether the error was harmless beyond a reasonable doubt under Rule 44.2(a)). Under Rule 44.2(a), a case with constitutional error must be reversed unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.[14] *See Sumrell,* 326 S.W.3d at 624.

In determining whether an error contributed to a defendant's conviction, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the State's theory, any defensive theories, closing arguments, and even voir dire if material to the appellant's claim. *Motilla v. State,* 78 S.W.3d 352, 355-56 (Tex.Crim.App. 2002). In addition, a reviewing court should consider as a factor the presence of "overwhelming" evidence supporting the judgment, as well as "'the character of the alleged error and how it might be considered in connection with other evidence in the case.'" *Id.* at 359 (quoting *Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App.

---

[14] Rule 44.2(a) provides that: "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment."

25

2000)).

As Appellant points out, in most cases in which courts have found that the trial court's error harmless, the removal was only temporary or short-lived. *See, e.g., Jasper,* 61 S.W.3d at 424 (defendant's absence from the courtroom when trial court excused two prospective jurors before the start of voir dire was harmless); *Reyna v. State,* No. 04-12-00584-CR, 2013 WL 5508372, at *3-4 (Tex.App. – San Antonio Oct. 2, 2013, no pet.) (mem. op., not designated for publication) (defendant's removal was so brief it did not contribute to the defendant's conviction or punishment and was therefore harmless error under Rule 44.2(a)); *Ashley*, 404 S.W.3d at 681 (defendant's temporary absence from the courtroom during voir dire was harmless); *Ramirez v. State,* 76 S.W.3d 121, 130 (Tex.App. – Houston [14th Dist.] 2002, pet. ref'd) (defendant's brief removal from the courtroom during closing arguments was harmless); *Fulmer v. State*, 401 S.W.3d 305, 315-16 (Tex.App. – San Antonio 2013, pet. ref'd) (defendant's temporary absence from the courtroom during the jury selection process was harmless).

In the present case, however, Appellant was not temporarily or briefly excluded from a minor portion of his trial, but was instead essentially excluded from his entire three-day trial. Not only did this impair Appellant's ability to assist his attorney in selecting the jury, but also limited Appellant's ability to assist counsel with virtually any portion of his defense. Further, we agree with Appellant that the jury could have drawn a negative inference from the fact that the trial court permanently excluded Appellant from his entire trial after only witnessing a single and relatively short outburst. Given the extreme nature of the trial court's decision to immediately banish Appellant from the courtroom based on that incident, the jury may have speculated that Appellant had previously engaged in much more egregious, and perhaps even violent, conduct to warrant that

26

decision.  *See, e.g., Kessel*, 161 S.W.3d at 48 (error in removing defendant from the entire punishment phase of his hearing was not harmless, as the jury may have been more receptive to the State's argument that the defendant posed a danger to the community after learning that the trial court had ordered appellant removed from the courtroom for the rest of the trial).

In light of our concern with the length of Appellant's removal from the courtroom and the potentially prejudicial nature of that removal, we would have had great difficulty in concluding that this error was harmless if Appellant had been convicted of capital murder, as requested by the State.  However, we find it significant that the jury rendered a verdict finding Appellant guilty of the lesser-included offense of murder, which was precisely what Appellant's defense counsel had requested, and which was therefore precisely in line with the defense strategy in this case.  As set forth above, defense counsel repeatedly advised both the jury panel and the jury that Appellant was "guilty" of shooting the victim with a deadly weapon, but that he had done so unintentionally, thereby warranting a conviction for murder, rather than capital murder.  Counsel then went one step further, and expressly advised the jury that the defense was *not* seeking a not-guilty verdict, and expressly requested that the jury enter a guilty verdict on the offense of murder.[15]

Although the jury was instructed on the possibility that it could acquit Appellant of any wrongdoing in Bosquez's killing, for all practical purposes, defense counsel's arguments left the jury with only two choices, to either convict Appellant of the greater offense of capital murder or

_____

[15] In particular, defense counsel advised the jury panel:  "Because I can tell you right now, this defendant, Roderick Morrison, is, in fact, guilty.  He is not going to be found not guilty and go home."  When a venire person expressed confusion over defense counsel's statements, and asked whether the jury would be able to acquit the defendant if it decided Appellant was not guilty of capital murder, counsel replied: "No.  He would be found guilty of the lesser offense of murder."  Defense counsel thereafter stated at least three more times during voir dire that he was admitting that Appellant was "guilty" of murder, explaining that he was making this admission to try to "narrow" the issues at trial.  During opening statements, as well as during closing arguments, defense counsel once again acknowledged that Appellant had shot the victim, but again claimed that Appellant had no intent to kill the victim, and expressly requested that the jury find Appellant guilty of murder, rather than capital murder.

27

the lesser offense of murder. Because the jury chose the lesser of these two offenses, as requested by defense counsel, it is difficult to conclude that Appellant was harmed by virtually any error that may have occurred at his trial.[16] In fact, even defense counsel acknowledged at the punishment phase of the trial that the jury had rendered a "favorable jury verdict" in his client's favor.

Further, as acknowledged by defense counsel, the State presented overwhelming and virtually unrefuted evidence at trial demonstrating that Appellant was the shooter and that he discharged the gun while holding it within an inch of the victim's head. Evidence that a defendant has used a deadly weapon in this manner, overwhelmingly, if not conclusively, establishes that the defendant is in fact guilty of murder. *See Adanandus v. State,* 866 S.W.2d 210, 215 (Tex.Crim.App. 1993) (if a deadly weapon is used in a deadly manner, the inference of intent to kill is almost conclusive); *Womble v. State,* 618 S.W.2d 59, 64 (Tex.Crim.App. 1981) (where a deadly weapon is fired at close range and death results, the law presumes an intent to kill).

In his brief, however, Appellant argues that the only eyewitness who identified him at trial as the shooter was his accomplice, Terrence Smith, who clearly had a motive to testify against him, in light of the State's offer to make him a "deal" based on his testimony at Appellant's trial. As well, Appellant challenges the credibility of Doyan's testimony, pointing out that there were multiple inconsistencies between her testimony and Terrence Smith's testimony regarding the details of what occurred on the morning of the shooting. According to Appellant, the jury may have reached a more "favorable verdict" if he had been present in the courtroom when these two witnesses testified, as the jury would have then been able to witness his "reaction" to their

---

[16] We note that, by analogy, when a defendant is given the minimum punishment authorized by law, the Texas Court of Criminal Appeals has held that virtually any error committed during the punishment phase of the trial must be considered harmless. *See generally Tollett v. State,* 799 S.W.2d 256, 260 (Tex.Crim.App. 1990); *Lehman v. State,* 792 S.W.2d 82, 88 (Tex.Crim.App. 1990).

28

inconsistent testimony. We disagree for several reasons.

First, Appellant has not pointed to any inconsistencies in the witnesses' testimony relevant to whether Appellant was the shooter, and we have found none. Second, Appellant's identification as the shooter was not established solely through the testimony of these two witnesses. Instead, the jury heard Appellant's own recorded statements at the jail admitting that he had shot the victim, and the results of the gun residue test conducted on Appellant's hands after the shooting constituted further evidence that Appellant was in fact the shooter.

Third, and most important, based on the trial strategy utilized by defense counsel, there simply was no other more "favorable verdict" the jury could have rendered, even if Appellant had been allowed back into the courtroom. Defense counsel did not request an instruction on any lesser-included offenses other than murder, and his defense strategy was to achieve an acquittal on the charge of capital murder, and to instead obtain a conviction on the lesser offense of murder, which was exactly the result achieved. We also find it significant that Appellant was allowed to listen to his entire trial from the holding cell, and was therefore presumably aware of his attorney's strategy in requesting that the jury return a murder conviction. Nevertheless, when questioned during the punishment phase of his trial, Appellant expressly stated that he was satisfied with his attorney's representation, and never once voiced any dissatisfaction with counsel's strategy.[17]

Accordingly, although we believe that the trial court's violation of Appellant's constitutional rights in permanently expelling him from his trial was not insignificant, under the unique circumstances presented in this case, we feel confident in concluding that the trial court's

---

[17] We also do not intend by our analysis to criticize defense counsel's trial strategy and performance, which ultimately was successful in avoiding a conviction for capital murder. Defense counsel was placed in a difficult situation by both his client's actions and by the state of the facts.

error did not contribute to Appellant's conviction or punishment, and that it was therefore harmless under the standards set forth in Rule 44.2(a).[18]   We overrule all of Appellant's points of error.

## Reformation of Error in the Judgment

Both Appellant and the State agree that the trial court's judgment of conviction contains a clerical error, mistakenly stating that Appellant was convicted of "capital murder" in violation of "19.03 Penal Code."   Both parties point out that the record clearly reflects that the jury returned a verdict finding Appellant guilty of murder in violation of Section 19.02 of the Penal Code, and that the trial court orally pronounced judgment in accordance with the jury's verdict.

When there is a variation between the oral pronouncement of a court's judgment and the written memorialization of the judgment, the oral pronouncement controls.   *Coffey v. State,* 979 S.W.2d 326, 328 (Tex.Crim.App. 1998).   In such cases, an appellate court is authorized to reform or modify the judgment to conform to the record of the proceedings and to render an appropriate judgment, in accordance with its authority under TEX. R. APP. P. 43.2.   *See Bigley v. State,* 865 S.W.2d 26, 27–28 (Tex.Crim.App. 1993) (appellate court has the power to modify incorrect judgments when the necessary data and information are available to do so); *see also Asberry v. State,* 813 S.W.2d 526, 529-30 (Tex.App. – Dallas 1991, pet. ref'd) (court of appeals has authority to correct errors of a "clerical" nature in the court's judgment to "make the record speak the truth").   We therefore modify the trial court's judgment of conviction to reflect that Appellant was found guilty of the offense of murder in violation of Section 19.02 of the Texas Penal Code, rather than capital murder in violation of Section 19.03 of the Texas Penal Code.

## CONCLUSION

---

[18] We note that because the jury did not assess punishment and because Appellant was allowed to be present in the courtroom during his sentencing hearing, the trial court's error in removing Appellant from the courtroom during voir dire and the guilt-innocence phase, could not have, and did not have, any impact on Appellant's sentence.

The trial court's judgment is affirmed as modified to reflect that Appellant was found guilty of murder in violation of Section 19.02 of the Texas Penal Code.

STEVEN L. HUGHES, Justice

November 4, 2015

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Publish)