

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

No. 06-21-00150-CR

JEFFERY DILLON GRANTHAM, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 20-0197X

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

A Harrison County jury convicted Jeffery Dillon Grantham of family violence assault by occlusion and evading arrest with a motor vehicle, both third-degree felonies. *See* TEX. PENAL CODE ANN. § 22.01(b)(2)(B) (Supp.), § 38.04(b)(2)(A). After the jury found the State's punishment enhancement allegations true, it assessed a sentence of fifty years' imprisonment for the family violence assault and a sentence of twenty-five years' imprisonment for evading arrest.

On appeal, Grantham argues that the trial court erred by failing to grant his counsel's motion to withdraw and that his absence during voir dire warranted a mistrial. Grantham also argues that the evidence is legally insufficient to support the jury's findings of guilt for both offenses and that the trial court erred by admitting hearsay testimony and the dash-camera recording. We find that (1) the trial court did not abuse its discretion by overruling the motion to withdraw, (2) Grantham's absence during voir dire did not require a mistrial, (3) legally sufficient evidence supports both convictions, (4) the trial court properly overruled Grantham's hearsay objection, and (5) Grantham failed to preserve his appellate point concerning the dash-camera recording. As a result, we affirm the trial court's judgment.

*(1)     The Trial Court Did Not Abuse Its Discretion by Overruling the Motion to Withdraw*

The record here established Grantham's dissatisfaction with his first and second appointed counsel. The trial court initially appointed Coke Solomon to represent Grantham. Solomon filed a motion to withdraw alleging "a total breakdown in communication and an irreconcilable conflict." The trial court granted Solomon's motion to withdraw and appointed Kyle Dansby in his place. On September 14, 2021, Dansby also filed a motion to withdraw,

2

which stated that Grantham refused to listen to him, accused the courts and police of being unfair, and "fired Counsel at the end of a jail visit on September 8."

At the hearing on counsel's motion, Grantham said that he had fired Dansby because he did not like or trust him and did not feel that Dansby would "fight for [him] . . . at all." Grantham, who took issue with Dansby's request to question Grantham's father about the offenses, also accused Dansby of threatening him, which prompted Dansby to notify the trial judge, "Almost everything [Grantham]'s telling you is a lie." The trial court concluded that Grantham's complaints did not require the appointment of new counsel. On appeal, Grantham argues that the trial court erred by failing to grant Dansby's motion to withdraw. We disagree.

"A trial court has discretion to determine whether counsel should be allowed to withdraw from a case." *Temple v. State*, 581 S.W.3d 812, 817 (Tex. App.—Texarkana 2019, no pet.) (citing *King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000)). "A trial court abuses its discretion when it acts without guiding rules or principles." *Id.* (citing *Robbins v. State*, 88 S.W.3d 256, 259–60 (Tex. Crim. App. 2002)). "We review the trial court's ruling in light of what was before the trial court at the time the ruling was made and uphold the trial court's judgment if it lies within the zone of reasonable disagreement." *Id.* (citing *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)).

"A trial judge is under no duty to search until he finds an attorney agreeable to the [indigent] defendant." *Barnett v. State*, 344 S.W.3d 6, 24 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Lyles v. State*, 582 S.W.2d 138, 141 (Tex. Crim. App. [Panel Op.] 1979); *Webb v. State*, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976)). "Once the court has appointed an attorney

3

to represent the indigent defendant, the defendant has been accorded" his right to counsel, "and the defendant then carries the burden of proving entitlement to a change of counsel." *Id.* (citing *Webb*, 533 S.W.2d at 784). "A defendant does not have the right to choose appointed counsel, and, unless he waives his right to counsel and chooses to represent himself or shows adequate reasons for the appointment of new counsel, he must accept court-appointed counsel." *Maes v. State*, 275 S.W.3d 68, 71 (Tex. App.—San Antonio 2008, no pet.) (citing *Burks v. State*, 792 S.W.2d 835, 838 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd)).

Based on its language, the trial court could have determined that Solomon's motion to withdraw was submitted due to Grantham's unwillingness to cooperate with him. Grantham's comments and demeanor during the hearing on Dansby's motion likely led the trial court to find Grantham to be a difficult client who disagreed with Dansby's trial strategy to question Grantham's father as a potential witness. The trial court was free to find that Grantham's vague expressions of dissatisfaction with his counsel amounted to nothing other than "personality conflicts [or] disagreements concerning trial strategy," which are "typically not valid grounds for withdrawal." *Barnett*, 344 S.W.3d at 24 (quoting *King*, 29 S.W.3d at 566). As a result, we find that the trial court did not abuse its discretion in overruling Dansby's motion to withdraw and, consequently, overrule this point of error.

*(2)    Grantham's Absence During Voir Dire Did Not Require a Mistrial*

Grantham asserts that he was entitled to a mistrial after the trial court excluded him from the courtroom during that phase of the proceedings. We conclude that a mistrial was not

4

required for two reasons: (a) Grantham forfeited his constitutional right to be present during voir dire, and (b) Grantham was not harmed by any statutory error.

The record shows that, before trial, Grantham's objections to going to trial with Dansby as his counsel resulted in impassioned utterances, which included telling the trial court, "I'm going to finish what I've got to say, man. You can't make me close my mouth." Grantham's demeanor and tone of voice prompted the trial court's warning for him to calm down. Nevertheless, Grantham continued his accusations that Dansby had "lie[d] to the judge" in the motion to withdraw by accusing Grantham of threatening him. When the trial court asked Grantham if he wished to be held in contempt of court, Grantham responded, "Then look what happens," and continued to tell Dansby that he did not trust him because he was "on the other side . . . on their side."

As shown by the following transcript, Grantham did not heed the trial court's warnings to curb his disruptive behavior and was removed from the courtroom:

> THE COURT: -- another word, Mr. Grantham, I'm going to pick the jury without you because I'm trying to be respectful to you, sir.
>
> THE DEFENDANT: That's not my lawyer.
>
> THE COURT: Do you want a jury to assess punishment or do you want the Court to do that --
>
> THE DEFENDANT: I want --
>
> THE COURT: -- in the event you are convicted, sir?
>
> THE DEFENDANT: I want another attorney, man.
>
> THE COURT: We -- answer the question, please, sir, Mr. Grantham.

5

THE DEFENDANT:  I need a lawyer.

THE COURT:  Do you want --

THE DEFENDANT:  I need a lawyer.

THE COURT:  Mr. Grantham, the last time, sir.  After this you'll be removed because I've tried to be --

THE DEFENDANT:  I need a lawyer.

THE COURT:  You can remove Mr. Grantham.  I'm finding him in contempt of court for his conduct. . . . Jury selection, we'll bring you back for jury selection, Mr. Grantham.

THE DEFENDANT:  Like I was saying, next thing you know, here comes Kyle Dansby.  He's my lawyer.  I'm -- I'm -- I'm explaining myself to him why did he put you an oral motion for speedy trial.  Ain't nobody else going to -- having speedy trial around there -- I mean, going to trial around this motherfucker, man.

THE COURT:  Can you please have him removed?

THE DEFENDANT:  Come on, man.

COURT OFFICER:  Yes, on my way, Judge.

. . . .

THE DEFENDANT:  Man, you know this shit is crooked as a motherfucker around here, crooked ass shit, man.  Fuck y'all.

(Defendant removed.)

MR. DANSBY:  Your Honor, for purposes of the record, as his attorney I do object to him being removed so that he can be present for the purposes of voir dire or even --

THE COURT:  No, he'll be -- I'm going to bring him back for voir dire.  When we take a break, I'll bring him in, and I'll explain to him again what is expected of his behavior.

6

MR. DANSBY:  I understand.

THE COURT:  And if he can't conform, then the same thing will happen. I am trying to be as respectful as I can, Mr. Dansby.

After Grantham was returned to the courtroom, the trial court explained that it was about to begin voir dire and would require Grantham to behave appropriately or he would again remove him from the courtroom.  Grantham assured the trial court that he would behave, but the promise was short-lived.

In front of the jury, Grantham interrupted voir dire to express his view that he was unhappy with Dansby, stating, "This is unconstitutional."  He then told the trial court, "[Y]ou can take me back to the jail.  I don't care."  Grantham then told the jury panel that he had two lawyers and that Dansby had come to see him only twice, an utterance that resulted in his second removal from the courtroom.  The record reflected that "five deputies had to take him down" and that Grantham "reacted violently" and made "multiple comments . . . as he had to get put on his stomach."

During a brief recess, Dansby moved for a mistrial because Grantham had "effectively on his own busted th[e] panel and introduced . . . bias and prejudicial information."  After noting that he had declined several opportunities to behave even after being admonished that he would be removed from the courtroom as a consequence of his misbehavior, the trial court denied the motion for a mistrial.  The trial court added that it had done everything it could "based on [Grantham's] disrespect, his unruliness and behavior," ruled that he would be brought back after jury selection to be admonished again before trial, and provided Grantham with another opportunity to correct his behavior.  The trial court then instructed the venire to disregard

7

Grantham's comments and behavior and to ensure that any verdict would be based solely on the admitted evidence. It then struck for cause any panel member who indicated that they could not be fair and impartial based on Grantham's behavior. The jury was selected from the remaining venire, and Dansby stated that he had no objection to the panel. The trial court requested Grantham's presence for trial, but after being placed under oath, a deputy testified that Grantham refused to dress or exit his jail cell.

"We review a trial court's decision to exclude a criminal defendant from trial for an abuse of discretion." *Morrison v. State*, 480 S.W.3d 647, 655 (Tex. App.—El Paso 2015, no pet.); *see Illinois v. Allen*, 397 U.S. 337, 343 (1970) ("We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."). "We [also] review a trial court's denial of request for a mistrial under an abuse-of-discretion standard." *Barba v. State*, 486 S.W.3d 715, 720 (Tex. App.—Texarkana 2016, no pet.) (quoting *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009)). "If the ruling was within the zone of reasonable disagreement, it must be upheld." *Id.* (citing *Ocon*, 284 S.W.3d at 884).

"Mistrial is . . . an appropriate remedy [only] when the error is highly prejudicial and incurable." *Id.* (citing *Ocon*, 284 S.W.3d at 884 (citing *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004))). It "is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). The remedy of a "mistrial is appropriate only 'when the objectionable event is so emotionally inflammatory that curative

8

instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant.'" *Id.* (quoting *Cano v. State*, 3 S.W.3d 99, 109 (Tex. App.—Corpus Christi 1999, pet. ref'd)).

### (a) *Grantham Forfeited His Constitutional Right to be Present During Voir Dire*

The Confrontation Clause of the Sixth Amendment is made applicable to the states via the Fourteenth Amendment. U.S. CONST. amends. VI, XIV; *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of the trial." *Allen*, 397 U.S. at 338. Grantham argues that his removal during voir dire violated the rights guaranteed to him under the Sixth and Fourteenth Amendments.

Yet, "[a] defendant's constitutional right to be present in the courtroom is not unlimited." *Morrison*, 480 S.W.3d at 656. "The defendant's voluntary absence from trial does not create grounds for reversal." *Morris v. State*, 554 S.W.3d 98, 121 (Tex. App.—El Paso 2018, pet. ref'd). "For constitutional purposes, the defendant need only be present in the courtroom at the commencement of a trial, which includes any time after the voir dire process has begun, and may thereafter voluntarily absent himself from the trial, either expressly or through his disruptive conduct." *Morrison*, 480 S.W.3d at 657.

"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." *Allen*,

9

397 U.S. at 343. As a result, a defendant's constitutional right to be present can be lost "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."[1] *Id.*; *see Morris*, 554 S.W.3d at 121; *Morrison*, 480 S.W.3d at 656.

Here, the record demonstrates that Grantham's "behavior was clearly of such an extreme and aggravated nature as to justify . . . his removal from the courtroom." *Allen*, 397 U.S. at 346. Before "his [initial] removal[,] he was repeatedly warned by the trial judge that he would be removed from the courtroom if he persisted in his unruly conduct." *Id.* When warned, Grantham indicated that he had no intention of complying when he told the trial court that he was "going to finish what" he wanted to say and proclaimed, "You can't make me close my mouth." The trial court's warning that it was going to proceed with voir dire in Grantham's absence had no effect on Grantham, who simply kept talking over the court and restating his desire for new counsel in flagrant disregard for the trial court's ruling that he was not entitled to an appointed counsel of his choice. While being removed, Grantham cursed in open court, further disrupting the proceedings and showing his disrespect for the trial court and the judicial system.

Despite his removal, Grantham "was constantly informed that he could return to the trial when he would agree to conduct himself in an orderly manner." *Id.* When the trial court afforded Grantham an opportunity to return and participate in voir dire, Grantham promised to

---

[1] "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Id.*

10

behave but interrupted voir dire to express his view that the proceedings against him were unconstitutional. When again asked to curb his behavior, Grantham refused, instead telling the trial court that he did not care if he was returned to jail. That showed that Grantham "would not have been at all dissuaded by the trial judge's use of his criminal contempt powers." *Id.* Moreover, Grantham engaged in a violent scuffle with five deputies who were trying to remove him.

Just as in *Allen*, "[t]he trial court in this case decided under the circumstances to remove the defendant from the courtroom and to continue his trial in his absence until and unless he promised to conduct himself in a manner befitting an American courtroom." *Id.* at 345–46. The United States Supreme Court has stated that removing a defendant from the courtroom "until he promises to conduct himself properly" is a "constitutionally permissible way[] for a trial judge to handle an obstreperous defendant." *Id.* at 343–44; *see Morrison*, 480 S.W.3d at 656.[2] This is because "the accused [cannot] be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him." *Allen*, 397 U.S. at 346.

"It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes." *Id.* Just as the United States Supreme Court found under similar circumstances, we find here that Grantham, by his behavior, forfeited "his right guaranteed by the Sixth and Fourteenth Amendments to be present throughout his trial." *Id.* We

[2]Because *Morrison* noted that the trial court granted a mistrial after the defendant's initial outburst, Grantham argues that "*Morrison* granted a mistrial and only after that step did the court deny the second motion for mistrial." *Morrison*, 480 S.W.3d at 651. Because the appeal was from the trial court's decision to exclude Morrison from a second trial after a second outburst, *Morrison* neither addressed nor held that a mistrial is required after a defendant's outburst.

11

conclude that, as a result, the trial court did not abuse its discretion by denying Grantham's motion for a mistrial on constitutional grounds. *See Moore v. State*, 670 S.W.2d 259, 261 (Tex. Crim. App. 1984) ("In the instant case, appellant offered no evidence at his motion for new trial to indicate that his absence was anything other than voluntary. Absent any evidence from the defendant to refute the trial court's determination that his absence was voluntary, we will not disturb the trial court's finding.").

(b)     *Grantham Was Not Harmed by Any Statutory Error*

Next, Grantham argues that the trial court abused its discretion by failing to grant a mistrial because Article 33.03 of the Texas Code of Criminal Procedure unequivocally requires a defendant's presence during voir dire. While we agree that there was statutory error under Article 33.03, we conclude that a mistrial was not warranted.

Article 33.03 of the Texas Code of Criminal Procedure requires the defendant's personal presence at trial, except "when the defendant voluntarily absents himself *after* pleading to the indictment or information, or after the jury has been selected when trial is before a jury." TEX. CODE CRIM. PROC. ANN. art. 33.03 (emphasis added). Because "an accused's right to be present at his trial is unwaivable" until *after* he has pled to the indictment or until the jury has been selected, Article 33.03 affords more protection to a defendant than do the Sixth and Fourteenth Amendments to the United States Constitution. *Morrison*, 480 S.W.3d at 657 (quoting *Miller v. State*, 692 S.W.2d 88, 91 (Tex. Crim. App. 1985)); *see Tracy v. State*, 14 S.W.3d 820, 826 (Tex. App.—Dallas 2000, pet. ref'd).

12

"Since the right to be present in the courtroom until jury selection has concluded is nonwaivable," Grantham's removal during voir dire constituted statutory error under Article 33.03. *See Morrison*, 480 S.W.3d at 658. Even so, in the absence of any constitutional error, a statutory violation of Article 33.03 "must be disregarded" unless we determine that the violation affected Grantham's "substantial rights." TEX. R. APP. P. 44.2(b). Because Grantham was absent only during voir dire, we ask whether he was denied a fair and impartial jury. *See Ashley v. State*, 404 S.W.3d 672, 681 (Tex. App.—El Paso 2013, no pet.) (citing *Gray v. State*, 233 S.W.3d 295, 298–99 (Tex. Crim. App. 2007); *Ladd v. State*, 3 S.W.3d 547, 562 (Tex. Crim. App. 1999)).

Here, nothing showed that Grantham was denied a fair and impartial jury because the trial court struck for cause any panel member who indicated that Grantham's behavior might impact their ability to be fair or impartial. The trial court also instructed the venire to disregard Grantham's comments and behavior and to ensure that any verdict would be based solely on the admitted evidence. "Mistrial is . . . an appropriate remedy [only] when the error is highly prejudicial and incurable," *Barba*, 486 S.W.3d at 720, but "[t]he law generally presumes that instructions to disregard and other cautionary instructions will be duly obeyed," *Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011). *See Hollaway v. State*, 446 S.W.3d 847, 856 (Tex. App.—Texarkana 2014, no pet.). Since no evidence was offered to rebut the presumption that the trial court's instruction had the desired curative effect, the trial court was free to conclude that the curative instruction was likely to prevent the jury panel from being unfairly prejudiced against Grantham. *See Barba*, 486 S.W.3d at 720. Also, Dansby affirmatively stated

13

that he had no objection to the seated jury. As a result, we conclude that the trial court did not abuse its discretion by finding that none of the events witnessed by the venire during voir dire were "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.*

Having found no abuse of discretion in the trial court's decision to overrule Grantham's motion for a mistrial, we overrule this point of error.

### (3)    *Legally Sufficient Evidence Supports Both Convictions*

Grantham also challenges the legal sufficiency of the evidence to support the jury's verdict of guilt for both offenses. After reviewing the evidence at trial and applying the proper standard of review, we find the jury was presented with sufficient evidence to support its verdict that Grantham was guilty of (a) family violence assault by occlusion and (b) evading arrest with a motor vehicle.

J.W. Harrell lived next door to Grantham's father. According to Harrell, Grantham lived in his father's guesthouse. On the day of the incident, Harrell testified that he witnessed Grantham arguing with Lacy Broadway. When asked if Grantham and Broadway were in a dating relationship, Harrell responded, "It's a relationship. I'm not sure exactly what they would have called it, but they were seeing each other." Harrell added that Broadway would stay with Grantham a few days at a time.

According to Harrell, Broadway was trying to leave the guesthouse during her argument with Grantham. Harrell said that he and Grantham's father had just volunteered to take Broadway home when Grantham hit her. Harrell said that Grantham punched Broadway in the

14

left side of her jaw and that she started bleeding right away, but that Grantham slapped Broadway again. Harrell and Grantham's father tried to break up the fight, but that prompted Grantham to start fighting with his father.

Francis Harris, a dispatcher with the Harrison County Sheriff's Office (HCSO), testified that she received an emergency call from Harrell's wife requesting a welfare check for her neighbors. Harrell also spoke to Harris and said that Grantham was going to "beat the hell out of his girlfriend and [then was] going for [his] dad." Harrell testified that he encouraged Broadway to run toward the road to flag down an approaching trucker.

The truck driver, Daniel Carter, called 9-1-1 and spoke with Harris. On the call that was played for the jury, Carter said that Broadway ran out of a residence with blood on her face, arms, and legs and flagged him down to get help. Broadway could be heard on the call and identified Grantham as the perpetrator. According to Carter, Grantham was still at the residence with his father.

Richard Koller, a deputy with the HCSO, testified that he was dispatched to Grantham's guesthouse, where he saw smoke coming from the building. As he approached the guesthouse, Grantham looked at Koller and "saw [Koller] running towards him." Grantham then ran toward a motorcycle and drove away, leading HCSO officers to chase him. Koller testified that he was in uniform and that the lights and sirens of his marked patrol unit were activated. Their chase of Grantham was recorded by two dash cameras, and the two recordings were played for the jury. The recordings showed Grantham evading officers on his motorcycle while they attempted to

15

apprehend him in marked patrol units. The recordings also showed that at least one patrol unit had flashing lights and a blaring siren.

In spite of the HCSO's efforts, Grantham escaped on foot into a wooded area after abandoning his motorcycle. Yet, because he returned to the scene of the crime, Grantham was apprehended at his home later that day after a scuffle with three police officers.

In the meantime, David Newsome, an HCSO investigator, had spoken with Broadway. Newsome testified that Broadway was injured, "disoriented," and "sweating profusely" and that she had disheveled hair. He saw that Broadway "was covered in bruises," had blood coming from her mouth and left hand, "had a substantial welp on her right quad," "was not speaking very much[,] and seemed like she was faint." According to Newsome, Broadway also had two black eyes and "[s]everal marks on her neck." Photographs of Broadway's extensive injuries were shown to the jury. According to Newsome, Broadway stated that her "boyfriend tried to kill" her. She continued, "He beat me in the head and choked me."

Broadway was taken by ambulance to the hospital. Her medical records contained her statement to medical personnel that "she was in an altercation with her boyfriend," and the "mechanism of injury" was noted as "aggravated assault with blunt object by boyfriend." Lindsey Gilreath, Broadway's sister, testified that she received a call from a paramedic on the day of the incident and went to the hospital because Broadway had been "attacked and . . . sustained injuries to where she . . . needed a ride home."[3] Gilreath testified that "every part" of Broadway's body was bruised, including her face, hands, chest, neck, knees, and legs. Gilreath

---

[3]Gilreath testified that Broadway was a drug addict with a history of mental illness and could not be located.

16

said that Broadway's lip "was cut open [and] stitched back up"; that "her eyes were almost completely swollen shut"; that "[h]er hands . . . looked like they had been blown up"; that her fingers did not bend; and that Broadway was hurting, limping, and "moaning and groaning the whole time." Gilreath also saw that Broadway had red marks on her neck.

After hearing this evidence, the jury convicted Grantham of family violence assault by occlusion and evading arrest with a motor vehicle.

Grantham argues that the evidence was insufficient to support the jury's verdicts of guilt for both offenses. "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

Grantham's sufficiency complaints assume that we are to ignore evidence admitted at trial that Grantham alleges was improperly admitted. In other words, Grantham's argument suggests that the evidence would have been insufficient absent any improperly admitted

17

evidence. This argument ignores the applicable standard of review. The Texas Court of Criminal Appeals has expressly stated that "[o]ur review of 'all of the evidence' includes evidence that was properly and improperly admitted." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see Williamson*, 589 S.W.3d at 297.

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Williamson*, 589 S.W.3d at 297 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

We address Grantham's evidentiary points of error as to the two offenses in turn.

*(a) Family Violence Assault by Occlusion*

The State alleged in its indictment that Grantham "intentionally, knowingly, and recklessly cause[d] bodily injury to L. Broadway, . . . a person with whom the defendant had or has had a dating relationship, . . . by intentionally, knowingly, and recklessly impeding the normal breathing or circulation of the blood of the complainant by applying pressure to the throat or neck." While Grantham acknowledges that the State proved his causing bodily injury to Broadway with the requisite intent, he argues that there was insufficient evidence to establish that they were in a dating relationship or that he impeded her normal breathing or circulation of

18

the blood by applying pressure to her neck. We find that sufficient evidence established (1) that Grantham and Broadway were in a dating relationship and (2) that occlusion occurred.

A "dating relationship" "means a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." TEX. FAM. CODE ANN. § 71.0021(b). "The existence of such a relationship shall be determined based on consideration of: (1) the length of the relationship; (2) the nature of the relationship; and (3) the frequency and type of interaction between the persons involved in the relationship." *Id.* "[T]hese factors are not standalone elements of the offense which the prosecution must prove beyond a reasonable doubt." *Edward v. State*, 635 S.W.3d 649, 657 (Tex. Crim. App. 2021). "Instead, they are guideposts for the jury to weigh in evaluating whether the broader definition in Subsection (b)— a 'continuing relationship of a romantic or intimate nature'—is met." *Id.* "A casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a 'dating relationship.'" TEX. FAM. CODE ANN. § 71.0021(c).

By applying the statutory requirements and viewing the evidence in the light most favorable to the verdict, we find that the dating-relationship element was satisfied. Harrell testified that Grantham and Broadway were in "a relationship" and "were seeing each other." Newsome testified, and Broadway's medical records showed, that Broadway referred to Grantham as her boyfriend. "Common usage of the word [boyfriend] by itself implies a continuing relationship of a romantic or intimate nature." *Edward*, 635 S.W.3d at 658. Moreover, Harrell testified that Broadway would come out and stay with Grantham a few days at a time. Evidence that Grantham and Broadway spent the night together when "viewed

19

holistically with the other evidence, would permit the jury to rationally infer that there was an intimate relationship between" the two.[4] *Id.*

In light of "the cumulative force of all the evidence through the appropriate lens of deference to the jury's verdict," we conclude that the evidence was legally sufficient for the jury to have rationally determined that Grantham and Broadway "'had a continuing relationship of a romantic or intimate nature,' rather than just a 'casual acquaintanceship or ordinary fraternization.'" *Id.* at 659 (quoting TEX. FAM. CODE ANN. § 71.0021(b), (c)).

We likewise find that the evidence was legally sufficient to support the jury's finding that Grantham impeded Broadway's normal breathing or circulation of the blood by applying pressure to her neck. The Texas Court of Criminal Appeals has interpreted the term "'impeding' . . . to include any degree of impediment to one's normal breathing or circulation of blood flow." *Philmon v. State*, 609 S.W.3d 532, 537 (Tex. Crim. App. 2020). As a result, "evidence of the complainant simply being unable to take deep breaths" will support the jury's finding on the occlusion element. *Id.* "This is an exceptionally low bar," since "[i]t takes very little effort or force to slightly hinder another's breathing or circulation, and there is notably no injury or threat of injury requirement aside from the impediment, however minimal." *Id.*

Even though Broadway's medical records showed that her neck condition was within normal limits and that she did not complain of neck pain, Newsome testified that Broadway accused Grantham of choking her. Newsome said that he observed signs of strangulation on

---

[4]*See Edward*, 635 S.W.3d at 659 (citing *Hooper*, 214 S.W.3d at 13 ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.")).

Broadway including bruising and redness on her neck, disorientation, and her "raspy," "hoarse voice." Photographs of Broadway's neck after the incident were shown to the jury, and Gilreath also testified that she saw bruises and red marks on Broadway's neck. From this evidence, a rational juror could have reasonably inferred that Grantham impeded Broadway's normal breathing.

We conclude that the evidence, when viewed in the light most favorable to the judgment, establishes that any rational jury could have found the essential elements of the offense of family violence assault by occlusion beyond a reasonable doubt. As a result, we overrule Grantham's sufficiency point of error with respect to this offense.

*(b)     Evading Arrest with a Motor Vehicle*

The State alleged that Grantham "did then and there while using a vehicle, intentionally flee from Richard Koller, a person the defendant knew was a peace officer who was attempting lawfully to arrest or detain the defendant." Grantham argues that there was no evidence establishing that he knew a peace officer was pursuing him to arrest him. We disagree.

After receiving emergency calls, HCSO dispatched police officers to the Grantham residence. Koller testified that he approached the guesthouse in his marked patrol unit with lights flashing and siren blaring. By the time he arrived, firefighters were already on the scene attempting to subdue the fire coming from the guesthouse. Koller exited the vehicle and ran toward Grantham in uniform.[5] On video, Grantham is seen driving away on a motorcycle that passed right by Koller's marked patrol unit. Lights and sirens are heard following Grantham

---

[5]Koller readily identified Grantham by his visible tattoos.

21

during the chase, even when he led officers off the road and into a previously unoccupied marshy area. With obvious knowledge that he was the one being chased in the marsh, Grantham abandoned his motorcycle and fled on foot into the woods.

From the recording of the chase and Koller's testimony, the jury could have easily concluded, beyond a reasonable doubt, that Grantham, while the guesthouse was in flames, used a motor vehicle to flee from Koller with full knowledge that Koller was a peace officer who was attempting to lawfully arrest or detain him. As a result, we find that legally sufficient evidence supports Grantham's conviction for evading arrest with a motor vehicle. We overrule Grantham's sufficiency point of error with respect to this offense.

*(4)      The Trial Court Properly Overruled Grantham's Hearsay Objection*

Grantham also argues that the trial court erred by admitting, over a hearsay objection, Newsome's statement that Broadway told him her "boyfriend tried to kill [her and] beat [her] in the head." "We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). Moreover, "[i]f the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the

22

ruling was made, then we must uphold the judgment." *Page v. State*, 213 S.W.3d 332, 337 (Tex. Crim. App. 2006).

"Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (citing TEX. R. EVID. 801(d)). "In order for hearsay to be admissible, it must fit into an exception provided by a statute or the Rules of Evidence." *Id.* (citing TEX. R. EVID. 802). We find that the theory of law applicable to the trial court's decision is the excited utterance exception, which allows admission of a "statement relating to a startling event or condition made while the declarant was under the stress of excitement that it caused."[6] TEX. R. EVID. 803(2).

"The basis for the excited utterance exception is 'a psychological one, namely, the fact that when a [person] is in the instant grip of violent emotion, excitement, or pain, he [or she] ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the "truth will come out."'" *Zuliani*, 97 S.W.3d at 595 (quoting *Evans v. State*, 480 S.W.2d 387, 389

---

[6]Rule 803(1) of the Texas Rules of Evidence allows the admission of hearsay that is also a present sense impression. TEX. R. EVID. 803(1). The State argued that Newsome's testimony was admissible because Broadway's statement was a present sense impression, which is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." *Id.* Under this exception, the utterance is "instinctive, rather than deliberate." *Fischer v. State*, 252 S.W.3d 375, 381 (Tex. Crim. App. 2008) (quoting *Commonwealth v. Coleman*, 326 A.2d 387, 389 (Pa. 1974)). The rule is based on the notion that "the utterance is a reflex product of immediate sensual impressions, unaided by retrospective mental processes." *Id.* (quoting *Commonwealth v. Farquharson*, 354 A.2d 545, 554 (Pa. 1976)). "If the declarant has had time to reflect upon the event and the conditions he observed, this lack of contemporaneity diminishes the reliability of the statements and renders them inadmissible under the rule." *Id.* "Once reflective narratives, calculated statements, deliberate opinions, conclusions, or conscious 'thinking-it-through' statements enter the picture, the present sense impression exception no longer allows their admission." *Id.*

Grantham argues that Newsome's testimony about Broadway's statement did not qualify as a present sense impression due to "a gap in time wherein she was able to reflect and formulate her thoughts and answers to the questions of the officer." The record shows that Newsome first arrived at the Grantham residence and took photos of the scene before interviewing Broadway. In any event, we express no opinion on whether Newsome's statement was admissible as a present sense impression because we find that it qualifies under the excited utterance exception.

23

(Tex. Crim. App. 1972)).  "In other words, the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event." *Id.*

In determining whether a hearsay statement is admissible as an excited utterance, the court may consider factors that include "the length of time between the occurrence and the statement, the nature of the declarant, whether the statement is made in response to a question, and whether the statement is self-serving." *Apolinar v. State*, 155 S.W.3d 184, 187 (Tex. Crim. App. 2005).  These are simply factors to consider; they are not, by themselves, dispositive. *Zuliani*, 97 S.W.3d at 596.  "The critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement."  *Id.* (quoting *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992), *overruled on other grounds by Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994)).

From the evidence presented, the trial court could have determined that not much time had passed between the incident and Newsome's interaction with Broadway.  Carter's 9-1-1 call showed that Harris had instructed him to pull over to the side of the road to wait for emergency responders to arrive and aid Broadway.  Newsome said he arrived at the Grantham residence "pretty quickly" after the first HCSO officer arrived on scene, but, after taking a few photographs, left the scene because "there was a victim up the road."

The evidence also showed that Broadway, who had been violently assaulted and sustained numerous injuries, was in the current grip of pain and that her response was not responsive to Newsome's questioning.  Before Newsome's testimony, Harrell testified that he witnessed Grantham's assault, and Gilreath described the many painful injuries sustained by

24

Broadway. Newsome said that he found Broadway injured, lying on the ground, sweating profusely, disoriented, and "not speaking much." Broadway's statement was made only after Newsome asked if she was okay. Broadway's answer—that her boyfriend tried to kill her—was nonresponsive to Newsome's question, and nothing indicates that it was self-serving.

After reviewing the evidence supporting the relevant factors considered in an excited utterance analysis, we cannot say that the trial court's decision to allow Newsome's testimony relating Broadway's statement was so clearly wrong as to lie outside the zone of reasonable disagreement. As a result, the trial court did not abuse its discretion by admitting Broadway's statement. We overrule this point of error.[7]

*(5)* *Grantham Failed to Preserve His Appellate Point Concerning the Dash Camera Recording*

Grantham also asserts that the trial court erred by "admitting the hearsay of" Deputy Adam Jones's dash camera recording through Koller. The State argues that Grantham's point of error on appeal does not comport with his trial objection. We agree with the State.

As a prerequisite to presenting Grantham's hearsay complaint to the dash camera recording for appellate review, the record must show that he made a timely objection at trial that "stated the grounds for the ruling . . . with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a). "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; [and] (2) to

---

[7]Also, over hearsay and Confrontation Clause objections, the trial court admitted Broadway's medical records, which contained Broadway's statement to medical personnel that "she was in an altercation with her boyfriend" and the notation that "mechanism of injury" was "aggravated assault with blunt object by boyfriend." Grantham does not complain about the admission of this evidence on appeal.

give opposing counsel the opportunity to respond to the complaint." *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009). As a result, a "point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see Swain v. State*, 181 S.W.3d 359, 368 (Tex. Crim. App. 2005).

Koller's body camera video was introduced as State's Exhibit 7. Koller testified that he had reviewed State's Exhibit 8, which was the dash camera recording of Jones, who had also been called out to the scene. Although there was no objection to State's Exhibit 7, Dansby "object[ed] as to authentication on number eight." After the State noted that Koller testified that he had also "witnessed everything that was on [Exhibit 8]," the trial court overruled Dansby's objection.

The record shows that Grantham objected only to the authentication of Jones's dash camera video and raised no hearsay objection. As a result, his complaint on appeal that the recording contained hearsay is unpreserved and overruled.[8]

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     July 27, 2022
Date Decided:      September 14, 2022

Do Not Publish

---

[8]To the extent that Grantham's brief can be interpreted as also raising an authentication issue to Jones's continuous and uninterrupted video, we overrule the argument since there was testimony from Koller that established the unquestioned chain of custody, that he had personal knowledge "that [the] item [was] what it [was] claimed to be," and that the video depicted the events he personally witnessed. TEX. R. EVID. 901(b)(1).

26